**HEDIN HALL LLP**
DAVID W. HALL (SBN 274921)
ARMEN ZOHRABIAN (SBN 230492)
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone:  415/766-3534
415/402-0058 (fax)
dhall@hedinhall.com
azohrabian@hedinhall.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON (SBN 174882)
FrankJ@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

Attorneys for Plaintiff and Putative Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN MICHAEL HART, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| BLOCK, INC., formerly known as Square Inc., JACK DORSEY, ANTHONY EISEN, and AMRITA AHUJA, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiff Jordan Michael Hart (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") and other public filings by Block, Inc. ("Block" or "Square" or the "Company") and Afterpay ("Afterpay"), as well as civil complaints and regulatory filings, records, guidance, and public releases filed in the United States and with the Supreme Court of New South Wales ("NSW Court"), and media and analyst reports about the Company and Company press releases.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF ACTION

1.     Plaintiff brings this securities class action on behalf of persons and entities who purchased or otherwise acquired Block securities during the period November 4, 2021 and April 4, 2022, including all former shareholders of Afterpay securities who acquired unregistered Block, Inc. Class A common stock (and/or corresponding SQ CHESS Depository Interests ("CDI")) ("Block Shares" or "Square Securities") in direct exchange for Afterpay shares pursuant to Block's January 31, 2022 acquisition and stock-for-stock merger with Afterpay (the "Merger" or "Acquisition").

2.     The action asserts non-fraud, strict liability claims under §§12(a)(1), 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act") against Block and certain current and former Block and Afterpay officers and directors, as well as scheme liability claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act").

3.     Defendant Block (formerly known as Square Inc.) is a technology and financial service company that provides apps, tools, and services for credit card, in app, and other digital card payment process.  Block is incorporated under the laws of Delaware and at the time of the Acquisition was headquartered in San Francisco, California.  Block's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SQ."

4.      On January 31, 2022, Block completed its Acquisition of Afterpay, then an Australian limited company listed on the Australian Stock Exchange, pursuant to a scheme of arrangement under Australia's Corporations Act 2001 (the "Scheme").  Pursuant to the financial terms of the Scheme, Block acquired all outstanding ordinary shares of Afterpay in exchange for 0.375 of a share of newly issued SQ class A common stock or corresponding SQ CDI.

5.      As a material term of the merger, Block and the Individual Defendants promised Afterpay's shareholders as follows:

> No offer of securities shall be made in the United States absent registration under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or pursuant to an exemption from, or in a transaction not subject to, such registration requirements.  ***The Square securities issued in the proposed transaction are anticipated to be issued in reliance upon an available exemption from such registration requirements pursuant to Section 3(a)(10) of the Securities Act***.

6.      In reliance on these and other material representations concerning the Merger, Afterpay's directors recommended to Afterpay shareholders that they vote in favor of the Merger, and a substantial majority of Afterpay's shareholders did so.

7.      As a result, on or around January 31, 2022, in connection with the Merger, Block offered and sold approximately 113 million unregistered Block Shares directly to former Afterpay shareholders as follows:

> On January 31, 2022 (Pacific Standard Time)/February 1, 2022 (Australian Eastern Daylight Time), Block completed its previously announced acquisition of all ordinary shares of Afterpay Limited, an Australian public company limited by shares and listed on the Australian Securities Exchange ("Afterpay" and such shares, "Afterpay Shares"), pursuant to a court-approved scheme of arrangement under Part 5.1 of Australia's Corporations Act 2001 (Cth) (the "Scheme" and such acquisition, the "Transaction"), as contemplated by the Scheme Implementation Deed (the "Deed"), dated as of August 1, 2021 (Pacific Daylight Time)/August 2, 2021 (Australian Eastern Standard Time) (as amended by the Amending Deed, dated as of December 6, 2021 (Pacific Standard Time) / December 7, 2021 (Australian Eastern Daylight Time)), by and among Block, Afterpay and Lanai (AU) 2 Pty Ltd, an Australian proprietary company limited by shares and an indirect wholly owned subsidiary of Block ("Block Acquirer").
>
> Upon the implementation of the Scheme, all Afterpay Shares issued and outstanding as of 12:00 a.m. on January 21, 2022 (Pacific Standard Time) / 7:00 p.m. on January 21, 2022 (Australian Eastern Daylight Time), the record date for the Scheme, were transferred to Block Acquirer, and the holders of such Afterpay Shares ("Scheme Participants") became entitled to receive, for each such share, either (a) where such Scheme Participant was a Share Elected Shareholder (as defined in the Deed), 0.375 shares of Block's Class A common stock ("New Block Shares"); or (b) where such Scheme Participant was a CDI Elected Shareholder (as

defined in the Deed), 0.375 CHESS Depositary Interests, each representing an ownership interest in a share of Block Class A common stock ("New Block CDIs"). In connection with the Transaction, 113,387,895 New Block Shares (including shares underlying 95,377,954 New Block CDIs) were issued to or for the benefit of Scheme Participants.

8.      But contrary to their representation to Afterpay's Board and shareholders, defendants did ***not*** satisfy the mandatory conditions necessary to exempt them from registration under §3(a)(10) and permit the issuance and sale of unregistered Block Shares.  Nevertheless, and in violation of §§5(a) and (c) of the Securities Act, no registration statement has been filed with the SEC or been in effect with respect to these Block Shares issued, solicited, and sold by means of the Merger.

9.      Had Block's Board and shareholders known at the time that defendants' representation concerning registration of the new Block Shares was false, Afterpay's Board and shareholders would not have agreed to the Merger at the price and exchange ratio stated.  Had Afterpay's Board and shareholders known the truth, the Merger either would have been scrapped altogether, substantially delayed until these SEC compliance issues were resolved, or it would have occurred at a more favorable price to Afterpay shareholders.

10.      In order to push the Acquisition through, defendants failed to comply with §3(a)(10)'s mandatory preconditions in several respects.  Foremost, defendants affirmatively misrepresented and withheld critical information from the NSW Court conducting the purported fairness hearing.  As detailed below, defendants omitted a bevy of material facts concerning the Company's long history of derelict data security, inexcusable failure to comply with baseline industry and regulatory data security standards, and the consequently massive yet undisclosed data breach that had Block had already suffered well before the date of the NSW Court fairness hearing.

11.      Defendants' grossly negligent failures deprived the NSW Court of critical information necessary to any genuine appraisal of the Merger's supposed "fairness," and furthermore deprived plaintiff and other Afterpay shareholders of their statutory right to appear and present to the NSW Court the host of serious concerns and material (yet undisclosed) information ahead of the Merger.  The NSW Court had no opportunity to consider this material information because defendants failed to disclose it.

12.     By misrepresenting and withholding critical information from the NSW Court, and by otherwise failing to ensure strict compliance with each of the enumerated conditions of §3(a)(10) promulgated by the SEC, defendants' own affirmative conduct rendered the so-called "fairness" hearing anything but and thus exemption under §3(a)(10) unavailable and invalid. Consequently, defendants' corresponding offer and sale of unregistered Block Shares to plaintiff and other former Afterpay shareholders in connection with the Merger was in direct violation of §5 of the Securities Act and plaintiff and Class Members have been damaged thereby. Accordingly, defendants are strictly liable under §§12(a)(1), 12(a)(2), and 15 of the Securities Act for the illicit offer and sale of unregistered Block Shares by means of the Merger.

13.     Further, as detailed herein, Defendants' misconduct constituted a knowing and reckless device, scheme, and artifice to defraud that operated as a fraud and deceit upon Plaintiff and the other members of the Class. Throughout the Class Period, the scheme: (i) deceived the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of Block securities; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire Block securities at artificially inflated prices. Accordingly, Defendants are also jointly and severally liable under §§10(b) and 20(a) of the Exchange Act, including Rule 10b-5(a) and (c) promulgated thereunder.

### JURISDICTION AND VENUE

14.     This Court has original subject matter jurisdiction under 28 U.S.C. §1331 because plaintiff assert claims arising under the laws of the United States, namely §§12(a)(1), 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77l(a)(1), 77l(a)(2), and 77o, and §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a).

15.     This Court has personal jurisdiction over each of the defendants and venue is proper here because at all relevant times, defendants were headquartered, maintained their principal place of business, and otherwise resided in this District.

16.     Defendants, as well as their agents, transact business in this county, affirmatively solicited and sold the subject securities to investors in and from California and this county, and those contacts have a substantial connection to the claims alleged herein.  Each of the defendants

1  either conducts business in and maintains operations in this District or is an individual who either

2  is present in this District for jurisdictional purposes or has sufficient minimum contacts with this

3  District as to render the exercise of jurisdiction by this Court permissible under traditional notions

4  of fair play and substantial justice.

5        17.    Venue is proper in this District under §22 of the Securities Act, 15 U.S.C. §77v,

6  and §27 of the Exchange Act, 15 U.S.C. §78aa, as well as under 28 U.S.C. §1391, because: (a) the

7  conduct at issue took place and had an effect in this District; (b) a substantial portion of the

8  corporate transactions and wrongs complained of herein occurred here; and (c) defendants have

9  received substantial compensation and other transfers of money here by doing business here and

10 engaging in activities having an effect in this District.

11       18.    In connection with the acts, transactions, and conduct alleged herein, Defendants

12 directly and indirectly used the means and instrumentalities of interstate commerce, including the

13 United States mail, interstate telephone communications, and the facilities of a national securities

14 exchange.

15 **PARTIES**

16       19.    Plaintiff purchased Block securities during the Class Period and was damaged as a

17 result of the federal securities violations and misconduct alleged herein.

18       20.    Defendant Block (formerly known as Square Inc.) is a technology and financial

19 service company that provides apps, tools, and services for credit card, in app, and other digital

20 card payment processing.  Block is incorporated under the laws of Delaware and at the time of the

21 Acquisition was headquartered in San Francisco, California.  Block's common stock trades on the

22 New York Stock Exchange ("NYSE") under the ticker symbol "SQ."  In January 2022, Block

23 acquired Afterpay by means of the Merger, and thereby offered and sold approximately 113

24 million unregistered Block Shares directly to plaintiff and other similarly situated former Afterpay

25 shareholders in exchange for their Afterpay shares.  Within this District, defendant Block

26 negotiated and entered into the contracts controlling the sales of unregistered Block Shares in

27 connection with Merger that are the subject of this action.  Furthermore, defendant Block sold and

28 incurred irrevocable liability within this District to deliver all the subject Block Shares to putative

1  class members.  By means of the securities violations alleged herein, Block realized hundreds of

2  millions of dollars in unjust enrichment in this District.

3        21.     Defendant Jack Dorsey ("Dorsey") is the co-founder of Block, has served as a

4  principal executive officer and director since July 2009, and resides and conduct Block business

5  in this District.  Dorsey served as Block's Chief Executive Officer ("CEO") and President from

6  July 2009 until April 2022 when he became Block Head and Chairperson of the Board.  As of

7  March 31, 2022, Dorsey owned 48,844,566 Class B Block common shares, more than 43% of the

8  Company's voting control.  Defendant Dorsey was directly and personally involved in the

9  negotiation of the Merger on behalf of Block, and he executed, controlled, and implemented the

10 terms and conditions by which the Merger and consequent offers and sales of unregistered Block

11 Shares were effected.  Through stock awards, bonuses, salary, and other incentives tied to the

12 Merger, defendant Dorsey realized millions of dollars in unjust enrichment.  Defendant Dorsey

13 reviewed and signed solicitation and other documents issued in connection Merger by which

14 plaintiff and other shareholders were solicited to participate in the stock-for-stock exchange in

15 connection with the Merger.

16        22.     Defendant Amrita Ahuja ("Ahuja") was at all relevant times the Chief Financial

17 Officer for Block.  Defendant Ahuja was directly and personally involved in the negotiation of the

18 Merger on behalf of Block, and she executed, controlled, and implemented the terms and

19 conditions by which the Merger, and consequent offers and sales of unregistered Block Shares,

20 were effected.  Defendant Ahuja signed the agreements and offering documents on behalf of Block

21 by which plaintiff and other shareholders were solicited to participate in the stock-for-stock

22 exchange in connection with the Merger.  Through stock awards, bonuses, salary, and other

23 incentives tied to the Merger, defendant Ahuja realized millions of dollars in unjust enrichment.

24        23.     Defendant Anthony Eisen ("Eisen") was at all relevant times the Co-CEO and co-

25 founder of Afterpay.  Defendant Eisen was directly and personally involved in the negotiation of

26 the Merger on behalf of Afterpay, and he executed, controlled, and implemented the terms and

27 conditions by which the Merger and consequent offers and sales of unregistered Block Shares were

28 effected.  Through stock awards, bonuses, salary, and other incentives tied to the Merger,

1    defendant Eisen realized millions of dollars in unjust enrichment.  Defendant Eisen directly

2    solicited plaintiff and other former Afterpay shareholders to participate in the Merger stock-for-

3    stock exchange, and further reviewed and signed solicitation and other documents issued in

4    connection Merger by which plaintiff and other shareholders were solicited to participate in the

5    stock-for-stock exchange in connection with the Merger.

6         24.    Defendants Dorsey, Ahuja and Eisen are referred to herein as the "Individual

7    Defendants."  The Individual Defendants each solicited the purchase of unregistered Block Shares

8    alleged herein, orchestrated and contributed to the Merger, and attended promotions to meet with

9    and present favorable information to Block and Afterpay investors, all motivated by their own and

10   the Company's financial interests.  Further, the Individual Defendants possessed the power and

11   authority to control the contents of the Company's reports to the SEC, press releases and

12   presentations to securities analysts, money and portfolio managers and institutional investors, i.e.,

13   the market.  Pursuant to the above device, scheme, and artifice to defraud, alleged herein, which

14   the Individual Defendants employed and knew or recklessly disregarded would act as a fraud or

15   deceit upon investors in Block securities, each Defendant participated in directly or indirectly and

16   were responsible for the device, scheme, and artifice to defraud.

17                          **SUBSTANTIVE ALLEGATIONS**

18        25.    This securities class action is brought on behalf of all persons and entities who

19   purchased or otherwise acquired Block securities during the Class Period, asserting non-fraud,

20   strict liability claims under §§12(a)(1), 12(a)(2), and 15 of the Securities Act, and scheme liability

21   claims under §§10(b) and 20(a) of the Exchange Act against Block and certain current and former

22   Block and Afterpay officers and directors.

23                     **STATUTORY AND REGULATORY FRAMEWORK**

24        26.    In the wake of the Wall Street Crash of 1929 and the ensuing Great Depression,

25   Congress passed a suite of federal securities laws, foremost the Securities Act of 1933 ("Securities

26   Act"), intended to curb "abuses in the securities industry, abuses which were found to have

27   contributed to the stock market crash of 1929 and the depression of the 1930's."  *SEC v. Capital*

28   *Gains Research Bureau, Inc*., 375 U.S. 180, (1963).  *Id*.  The "fundamental purpose" of these laws

is public investor protection: "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*." *Id.* At passage of the Securities Act, Congress described its purpose as follows:

> The purpose of this bill is to protect the Investing public . . . The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect . . . against . . . dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities . . .

Rep. No. 47, 73d Cong., 1st Sess., 1 (1933). Indeed, "[i]t requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail in every facet of the securities industry." *Capital Gains Research Bureau, Inc.*, 375 U.S. at 186.

27. The centerpiece of this federal securities regime is §5 of the Securities Act, which makes it unlawful to offer or sell securities in interstate commerce unless a compliant registration statement and prospectus as to such securities is on file and in effect with the SEC. In effect, these provisions require the registration of all national transactions in securities, including offers and sales not only by the company that has issued securities (the "issuer"), but also by its controlling officers.

28. Registration in accordance with §5 is a two-step process. To register a transaction, the issuer files a registration statement, the contents of which are dictated by extensive regulations. A typical registration statement in connection with the initial public distribution of securities stretches for hundreds of pages and contain wide ranging disclosure of risks, trends, and uncertainties facing the issuer and its business. Next, the SEC reviews this comprehensive document. After resolving all the SEC's comments, a company can request the SEC declare the registration statement effective. Offers are strictly regulated during the registration process and only after the registration statement has been declared effective are sales permitted.

29. The goal of these rules is public investor protection. This mandate for extensive disclosure is in place to protect the public from exploitation by corporate insiders (*i.e.*, those in control of the company). Insiders of an issuer know far more about the company's history, current activities, and prospects, than anyone else. In the absence of regulation, insiders can use this

information to take advantage of outsiders to sell them securities at inflated prices, to sell them valueless securities, or to defraud them.  By leveling the playing field, §5 deprives insiders of this opportunity.  When newly issued securities become available for trading on national exchanges – such as the NYSE or the NASDAQ – or otherwise enter the national market, the mandated registration process and related securities-law requirements ensure that accurate and continuously updated information is provided to the investing public.  The informational richness of the trading environment is seen as one of the keys to the unequaled success of the U.S. equity markets.

30.     Though registration provides well-accepted benefits to investors and capital markets, its requirements are subject to a group of narrowly tailored, contextual exemptions. Sellers may engage in lawful **unregistered** transactions only if they have strictly complied with the terms of one of these exceedingly narrow provisions.  The SEC has explained how such exemptions fit into the overarching policy goals of the securities laws:

> [T]hese exemptions are plainly designed to do no more than mark out specific situations in which Congress considered the protection afforded by registration either unnecessary, unduly burdensome, or an inappropriate subject for Federal legislation.  The general pattern of the [Securities] Act – *a sweeping prohibition, subject to a limited number of carefully defined exemptions –* considered together with the nature and particularity of the exemptions themselves emphasizes rather than obscures the basic purpose of the [Securities] Act to protect investors and stresses the generality of its intended application. . . .  [I]t is clear that *the exemptions must be strictly construed* and that *the claimant of an exemption has the burden of showing that he falls within the terms of the exemption he claims*.

*In the Matter of Ira Haupt & Company*, S.E.C. Release No. 34-3845, 23 S.E.C. 589 (1946)

31.     For as President Franklin Roosevelt emphasized at passage, the central purpose of these provisions under the Securities Act is to replace "the ancient rule caveat emptor" with the "doctrine of '*let the seller beware*,'" – "It puts the burden of telling the whole truth on the seller" in order to "give some impetus to honest dealing in securities and thereby bring back public confidence." H.R. Report No. 85, 73rd Cong. 1st sess., – (1933).

32.     To that end, the Securities Act "imposes strict liability on offerors and sellers of unregistered securities, who are held accountable *regardless of whether there was any degree of fault*, negligent or intention."  *S.E.C. v. Tuchinsky*, 1992 WL 226302, at *2 (S.D. Fla. 1992); *Swenson v. Englestad*, 626 F.2d 421 (5th Cir. 1980) ("Recovery may be had under [12(a)(1)]

1    regardless of whether (the purchaser) can show any degree of fault, negligent or intentional, on the

2    seller's part.").  As such, a defendant's ***good faith is not relevant*** to whether there has been a

3    primary violation of the registration requirements."  *S.E.C. v. Holschuh*, 694 F.2d 130, 137 (7th

4    Cir. 1982).  The United States Supreme Court's admonishments ring true: Courts must "[k]eep[]

5    in mind the broadly remedial purposes of federal securities legislation" and the consequent

6    "***imposition of the burden of proof on an issuer who would plead [any] exemption***."  *S.E.C. v.*

7    *Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

8                    **DEFENDANTS' UNLAWFUL SALE OF UNREGISTERED SECURITIES**

9            33.     On August 1, 2020, Block (then still known as Square) announced that the boards

10   of directors of Block and Afterpay, then an independent Australian public company, had reached

11   agreement on the terms of a recommended acquisition of Afterpay by Block.  The financial terms

12   of the Merger required Block to acquire all of the outstanding ordinary shares of Afterpay in

13   exchange for 0.375 shares of new Square Shares:

14           Square and Afterpay are proposing to engage in a business combination
             under Australian corporate law, pursuant to which Square Sub will acquire all of
15           the outstanding ordinary shares of Afterpay, and Afterpay will thereby become a
             wholly owned subsidiary of Square Sub and an indirect wholly owned subsidiary
16           of Square.  As set forth in the Transaction Agreement, the business combination
             will be carried out in accordance with a scheme of arrangement under the Australian
17           Corporations Act to be submitted for approval by Afterpay shareholders and the
             Court.
18
             Subject to the terms and conditions set forth in the Transaction Agreement,
19           upon implementation of the Scheme, all outstanding Afterpay ordinary shares as of
             the Scheme Record Date will be transferred to Square Sub, and the holders of such
20           Afterpay ordinary shares (other than Ineligible Foreign Shareholders, as described
             below under "The Transaction Agreement, Scheme and Deed Poll – Ineligible
21           Foreign Shareholders") will have the right to receive, for each such share, either (1)
             0.375 New Square Shares or (2) 0.375 New Square CDIs.  Where an Afterpay
22           shareholder has a registered address in Australia or New Zealand, that shareholder
             is to receive New Square CDIs but may elect to receive New Square Shares.  Where
23           an Afterpay shareholder's address on the Afterpay register is located outside of
             Australia and New Zealand, that shareholder is to receive New Square Shares but
24           may elect to receive New Square CDIs.  Certain foreign Afterpay shareholders will
             be deemed ineligible to receive New Square Shares or New Square CDIs, and will
25           instead have the shares or CHESS Depositary Interests to which they are entitled
             issued to a sale agent who will sell the securities and remit the sale proceeds (net
26           of certain costs) to the relevant shareholders.

27           At any time prior to the lodgement of a draft of the Scheme Booklet with
             ASIC pursuant to Section 411(2) of the Australian Corporations Act, ***Square may***
28           ***elect to change the Scheme Consideration to consist of (1) either 0.37125 New***

***Square Shares or New Square CDIs and (2) cash in an amount equal to 1% of the original Scheme Consideration in Australian dollars*** ("Cash Election").  If Square makes the Cash Election, the per share cash payment will be determined by the volume weighted average trading price of a share of Square Class A common stock on the NYSE over a to-be-determined five trading day period preceding the Implementation Date.  ***Square does not expect to make the Cash Election***.

34.     Importantly, as a material term of the deal, Block promised as follows: "No offer of securities shall be made in the United States absent registration under the U.S. Securities Act of 1933, as amended (the "Securities Act"), or pursuant to an exemption from, or in a transaction not subject to, such registration requirements.  ***The Square securities issued in the proposed transaction are anticipated to be issued in reliance upon an available exemption from such registration requirements pursuant to §3(a)(10) of the Securities Act***.

**Block Invokes, Yet Fails to Satisfy, Mandatory Conditions Under §3(a)(10)**

35.     Based upon these representations and in compliance with the agreement, Afterpay's Board of Directors recommended to Afterpay's shareholders that they vote in favor of the acquisition by Block.  A majority of Afterpay Shareholders voted in favor of the Acquisition.  After obtaining shareholder approval from Afterpay shareholders based upon these material representations, defendants broke their promise.  As detailed herein, the Block Shares were never registered, and they do not qualify for exemption under §3(a)(10) or otherwise.

36.     Section 3(a)(10) is an exceedingly narrow exemption that was enacted principally for bankruptcy proceedings and related readjustments of the rights of holders of outstanding securities, claims and property interests, where the holders will be protected by court supervision of the conditions of the issuance of their new securities.  Always, it is strictly construed to protect against resort to the exemption in evasion of the registration requirements of the Securities Act.  To guard against misuse of the exemption and thus guard against evasion of the strict registration requirement of the Securities Act, the SEC has specifically identified eight conditions that "***must be met by an issuer before***" the issuer or other sellers can rely upon the exemption provided in §3(a)(10):

    a)     The securities must be issued in exchange for securities, claims or property interests; they cannot be offered for cash.

b)     A court or authorized governmental entity must approve the fairness of the terms and conditions of the exchange.

c)     The reviewing court or authorized governmental entity must (1) find, before approving the transaction, that the terms and conditions of the exchange are fair to those who will be issued securities, and (2) be advised before the hearing that the issuer will rely upon the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.

d)     The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and condition of the transaction.

e)     A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.

f)     The fairness hearing must be open to everyone who is proposed to be issued securities in the proposed exchange.

g)     Adequate notice of the hearing must be given to all those persons.

h)     There cannot be any improper impediments to the appearance by those persons at the hearing.

*See, e.g.,* SEC Revised Staff Legal Bulletin No. 3 (October 20, 1999).[1]

37.     In narrowly construing the exemption under §3(a)(10), the SEC and courts nationwide have held that where, as here, issuers and other sellers of unregistered securities have failed ensure strict compliance with each of the enumerated conditions of §3(a)(10) as promulgated in the foregoing SEC regulatory guidance, that failure renders the exemption under §3(a)(10) unavailable and consequently any corresponding offers or sales of unregistered securities in violation of §5.  And because the §5 regime lays the burden of establishing complete compliance with any purported exemption exclusively on party selling unregistered securities – *i.e.*, "seller beware" – it imposed strict liability for any non-exempt offers or sales of unregistered securities made regardless of any fault or good faith on the part of the seller, regardless of whether purported

---

[1]     Because SEC "staff bulletin[s]" are "based on [SEC] expertise," courts nationwide uniformly hold that they "should be considered," and courts accordingly "draw heavily on these criteria" in analyzing compliance with §3(a)(10).  *See, e.g., Argentinian Recovery Co. LLC v. Board of Directors of Multicanal S.A.*, 331 B.R. 537, 550 (S.D.N.Y. 2005) (relying on SEC Revised Staff Legal Bulletin No. 3 (Oct. 20, 1999)); *see also Trade Partners*, 2008 WL 4911797, at *2 ("the court finds it to be helpful and persuasive in setting forth factors to be considered in determining fairness for purposes of section 3(a)(10).").

1  fairness hearing has already occurred, and regardless of whether the fairness of the transaction has

2  been ostensibly approved by the reviewing court.

3       38.    The SEC and courts nationwide have also held that the §3(a)(10) exemption is not

4  available where, as here, information relevant to either the transaction's fairness or the

5  preconditions of the exemption itself are misrepresented, withheld, or otherwise not disclosed in

6  full to the court for considerations at the purported fairness hearing. Where, as here, important

7  information has been misrepresented or withheld from the court for consideration at the fairness

8  hearing, any ensuing offers or sales of unregistered securities pursuant to the consequently invalid

9  3(a)(10) exchange are in violation of §5.

10       39.    As detailed herein, defendants were required to register the newly issued Block

11  Shares, failed to ensure strict compliance with §3(a)(10)'s mandatory preconditions, and

12  affirmatively misrepresented and withheld an array of critical information from the NSW Court

13  conducting the fairness hearing.

14       40.    Defendants' failures not only imposed improper impediments to plaintiff's and

15  other investors' ability to attend and meaningfully participate in the NSW fairness hearing.

16  Defendants' affirmative misconduct and negligence or recklessness deprived the NSW Court itself

17  from receiving and considering a host of serious concerns and objections to the Merger.

18  Defendants kept blinders on the NSW Court by misrepresenting and withholding critical

19  information, while at the same time keeping improper impediments in place that prevented plaintiff

20  and other Afterpay shareholders from bringing that critical omitted information to the NSW

21  Court's attention. Accordingly, by their abject failure to ensure strict compliance with each of the

22  enumerated conditions of §3(a)(10), it was defendants' own affirmative conduct that rendered the

23  exemption under §3(a)(10) unavailable and invalid. Consequently, defendants' offer and sale of

24  unregistered Block shares pursuant to the Merger were non-exempt and thus in violation of §5 of

25  the Securities Act.

26

27

28

**DEFENDANTS MISREPRESENT AND OMIT MATERIAL INFORMATION FROM THE NSW COURT TO PUSH THROUGH A SHAM "FAIRNESS" HEARING**

41.     On December 17, 2021, Block notified its shareholders that a supposed "fairness" hearing had been conducted before the NSW Court, which – unbeknownst to the NSW Court itself – had approved the Scheme on the basis of representations from defendants, and corresponding submissions, that were, as detailed below, materially false and misleading and omitted material information critical to any genuine assessment of the Merger's supposed "fairness."

**Block's Business Depends on Secure Collection and Storage of Customer Personally Identifiable Information**

42.     Block operates a payment platform aimed at small and medium sized businesses that allows them to accept credit card payments and to use tablet computers as payment registers for point-of-sale systems.  Block also provides financial and marketing services.

43.     Block offers a payment application called Cash App, which was initially designed to make Peer-to-Peer payments, *i.e.*, for consumers to transfer money to individuals and businesses.  Cash App has since been configured for additional uses such as direct deposit payments, the purchase of cryptocurrency, and other investments.

44.     Cash App users must provide the Company with their personally identifiable information ("PII") to open an account on the platform, which is collected and stored electronically by Block for security purposes.  The Company reassures users that "any information you submit is encrypted and sent to our servers securely," touting the use of "cutting-edge encryption and fraud detection technology" which makes sure "your data and money is secure."  *See* https://cash.app/help/us/en-us/3127-keeping-your-cash-app-secure.   The Company's privacy notice states that the Company takes "reasonable measures, including administrative, technical, and physical safeguards, to protect your information from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction."  *See* Privacy Notice, https://cash.app/legal/us/en-us/privacy.

**Before the Merger, Defendants Identified Substantial Cybersecurity Risks**

45.     In public filings with the SEC, defendants acknowledged the substantial risks that data loss or security breaches pose to the Company.  In the Company's Annual Report on Form

10-K filed with the SEC on February 26, 2020 (the "2019 10-K"),[2] the Individual Defendants expressly noted the risk of a data breach, and the material impact on the Company that would be posed by such a breach:

> If our privacy and security measures or those of third party developers and vendors are inadequate or are breached, and, as a result, there is improper disclosure of or someone obtains unauthorized access to or exfiltrates funds or sensitive information on our systems or our partners' systems, or if we suffer a ransomware or advanced persistent threat attack, or if any of the foregoing is reported or perceived to have occurred, our reputation and business could be damaged. If the sensitive information is lost or improperly accessed, misused, disclosed, destroyed, or altered or threatened to be improperly accessed, misused, disclosed, destroyed, or altered, we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to litigation, regulatory scrutiny, and investigations.

46.    The 2020 10-K reflected the Individual Defendants' awareness that the Company was an attractive target for hackers: "[E]lectronic payment products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers," posing a material risk to Block and its core operations:

> Because the techniques used to obtain unauthorized access to data, products, and services and to disable, degrade, or sabotage them change frequently and may be difficult to detect or remediate for long periods of time, we and our customers may be unable to anticipate these techniques or implement adequate preventative measures to stop them. *If we* or our sellers or other customers *are unable to anticipate or prevent these attacks*, our sellers' or other customers' businesses may be harmed, *our reputation could be damaged, and we could incur significant liability*.

47.    In Block's Annual Report on Form 10-K filed with the SEC on February 23, 2021 (the "2020 10-K"),[3] the Company again detailed the material damage that could be incurred by the Company resulting from a security breach:

> If our privacy and security measures or those of third party developers and vendors are inadequate or are breached, and, as a result, there is improper disclosure of or someone obtains unauthorized access to or exfiltrates funds or other sensitive

---

[2]    Defendant Dorsey certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 2019 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

[3]    Defendant Dorsey certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

information on our systems or our partners' systems . . . ***our reputation and business could be damaged***. If the sensitive information is lost or improperly accessed, misused, disclosed, destroyed, or altered or threatened to be improperly accessed, misused, disclosed, destroyed, or altered, ***we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to litigation, regulatory scrutiny, and investigations***.

48.  The 2020 10-K reiterated that the Company was a prime target for hackers and other malicious actors:

Additionally, electronic payment, hardware, and software products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers and other malicious actors . . . If we or our sellers or other customers are unable to anticipate or prevent these attacks, our sellers' or other customers may be harmed, ***our reputation could be damaged, and we could incur significant liability***.

49.  On November 4, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), which was signed by defendant Dorsey. The 3Q21 10-Q disclosed the risk in connection with "real or perceived security breaches or incidents or human error in administering our software, hardware, and systems," as well as the risk that "***[o]ur products and services may not function as intended due to errors in our software, hardware, and systems, product defects, or due to security breaches or incidents or human error in administering these systems, which could materially and adversely affect our business***." (Emphasis in original).

50.  The 3Q21 10-Q represented as follows: "Any errors, data leaks, security breaches or incidents, disruptions in services, or other performance problems with our products or services caused by external or internal actors could hurt our reputation and damage our customers' businesses." It further acknowledged that data security breaches posed a material risk to the Company, stating as follows:

[S]ecurity breaches or incidents such as cyber-attacks or identity theft could disrupt the proper functioning of our software products or services, cause errors, allow loss or unavailability of, unauthorized access to, or disclosure of, proprietary, confidential or otherwise sensitive information of ours or our customers, and other destructive outcomes . . . . Any of the foregoing issues could lead to product recalls and inventory shortages, result in costly and time-consuming efforts to redesign and redistribute our products, give rise to regulatory inquiries and investigations, and result in lawsuits and other liabilities and losses, which could have a material and adverse effect on our business.

51.     The 3Q21 10-Q also stated that "[a]s [the Company's] hardware and software services continue to increase in size and complexity, and as we integrate new, acquired subsidiaries with different technology stacks and practices, these risks may correspondingly increase as well."

**Block's Business Depends on Strict Compliance With Data Security And Privacy Laws**

52.     At the time of the Merger, the Company was subject to a thicket of strict state and federal data privacy laws.  For example, the Federal Trade Commission ("FTC") enforces compliance with the Federal Trade Commission Act ("FTCA").  15 U.S.C. §45, which prohibits "unfair or deceptive acts or practices in or affecting commerce."  The FTC considers a company's failure to maintain reasonable and appropriate data security over customers' PII to be an "unfair practice" in violation of the FTCA.

53.     The FTC requires that companies implement sound data security practices to protect PII.  As far back as 2016, the FTC updated its guide for "protecting personal information" to establish five key principles of a sound data security plan, including: 1) knowing what personal information a company has on its servers; 2) scaling down the retention of information to what is truly needed; 3) protecting the information the company has retained; 4) properly disposing of the information that is not needed; and 5) creating a detailed plan to respond to security incidents.  The FTC has brought enforcement actions against companies for failing to protect customers' PII reasonably and adequately and considered the failures as a violation of the prohibition on unfair and deceptive practices under §5 of the FTCA.

54.     Similarly, California law requires a business to notify any California resident whose unencrypted personal information was acquired, or reasonably believed to have been acquired, by an unauthorized person.  California Civ. Code §1798.82(a).  When a company is required to issue a security breach notification to more than five hundred California residents as a result of a single data security breach, that company must electronically submit a sample copy of that security breach notification to the California Attorney.  The California Consumer Privacy Act of 2018 (the "CCPA") gives consumers additional rights regarding data security, including the right to know what personal information is retained by a company and how it is being used.  Consumers must also be able to obtain and delete their own PII at any time.

55.     So too, Delaware updated its data privacy laws in 2017.  The new law requires persons conducting business in the state to "implement and maintain reasonable procedures and practices to prevent the unauthorized acquisition, use, modification, disclosure, or destruction of personal information collected or maintained in the regular course of business."  6 Del. C. §12B-100.  The Delaware Attorney General must be notified if more than five hundred Delaware residents were affected in the breach.  Similarly, the Identity Theft Enforcement and Protection Act, which Texas enacted in 2007, requires businesses to implement "reasonable procedures" to prevent the unlawful use of customers' personal data.  Sec. 521.052.  In June 2019, Texas enacted House Bill 4390, the Texas Privacy Protection Act.  Many of the law's provisions went into effect in 2020.  The Privacy Protection Act requires businesses to notify affected customers of a data breach involving sensitive personal information within sixty days of the incident.  Further, the Texas Attorney General must be notified if the data breach affected two hundred and fifty or more Texas residents.

**Block Violated Accepted Industry Cybersecurity Standards**

56.     In 2019, IBM published a "Cost of Data Breach" report that analyzed data breaches from 500 organizations.  The report found that in 2019 the average cost per breach within the financial services industry was $5.86 million.  Another IBM study found that human error was a major contributing cause in 95% of all data breaches.  *See* Micke Ahola, *The Role of Human Error in Successful Cyber Security Breaches,* https://blog.usecure.io/the-role-of-human-error-in-successful-cyber-security-breaches.

57.     The IBM X-Force Threat Intelligence Index for 2021 stated that the financial services industry continues to be one of the most commonly targeted business, suffering 23% of all attacks.  IBM provides a list of best practices for companies to follow, including: protecting against insider threats; building and training an "incident response team within an organization"; and stress testing an "organization's incident response plan to develop muscle memory."  Similarly, the Microsoft Threat Protection Intelligence Team recommends that companies, among other things, apply the latest security updates, use threat and vulnerability management, and monitor for adversarial activities in order to protect PII.

58.     Further, companies can suffer from ex-employees retaining access to sensitive data after their employment.  According to a study by Osterman Research, 69% of the organizations surveyed have suffered a loss of data as a result of employee departure.  The Osterman Research White Paper provides best practices for companies to prevent employees from accessing sensitive data after leaving their positions, including maintaining "complete, ongoing visibility of sensitive corporate data across all of their endpoints, cloud applications and any other repositories where this data might be stored."

**Block and the Individual Defendants Had Long Ignored Red Flags Demonstrating Block's Derelict Data Security Practices**

59.     Ahead of the Merger, Cash App user accounts had been hacked on a number of occasions, resulting in fraudulent transfers of customer funds.  In March 2021, it was reported that hackers accessed and took all the cash, stock, and bitcoin in certain Cash App customer accounts. *See* Alexis Keenan, *Square's Cash App Vulnerable to Hackers*, *Yahoo*, https://www.yahoo.com/video/squares-cash-app-vulnerable-to-hackers-customers-claim-113556593.html.  Cash App customers whose accounts had been hacked had attempted to contact Cash App about the incidents, but nothing was done.  Many affected users found it nearly impossible to reach a live representative to discuss the security breaches.  Scam artists played on affected users' frustrations by creating imposter company contact numbers to steal customers' account information.

60.     From February 2020 through March 2021, the Better Business Bureau (BBB) received and reviewed 2,485 complaints concerning Cash App, and 3,532 concerning Square, where customers also logged Cash App complaints.  In stark contrast, complaint for Venmo, a Cash App competitor, totaled a mere 928 and only 83 complaints were handled for Zelle.  In 2020, before the Merger, Cash App user reviews mentioning the words "fraud" or "scam" had increased by 335%.

61.     An August 2021 *Medium* article discussed the proliferation of hacking attacks on Cash App and Block's lack of response.  The Company's lack of internal controls was identified as the cause for the numerous security breaches: "A company, like Cash App, is however at fault

1   for not having better blocks and ways to flag anything suspicious as well as having a dedicated

2   way for customers to report fraud if it does happen."  *See* Audrey Malone, *You Can Get Hacked*

3   *on Cash App Easier than you Might Think*, August 30, 2021,

4   https://medium.datadriveninvestor.com/you-can-get-hacked-on-cash-app-afbbf5420acf.

5   **Block's Derelict Security Practices Had Already Resulted in a Massive Undisclosed Data**
    **Breach**

6

7   62.    At the time of the Merger exchange on January 31, 2022, defendants had still made

8   no disclosure of the early December 2021 data breach.  Even with the Company's 2021 10-K, the

9   defendants still made no disclosure of the data breach; On the same day, the Company filed with

10  the SEC a Current Report on Form 8-K, attaching a letter to shareholders announcing the

11  Company's fourth quarter financial results, yet neither the 8-K nor the shareholder letter made any

12  mention of the security breach which potentially affected over eight million customers.  It was not

13  until April 4, 2022, in a Current Report on Form 8-K filed with the SEC, that Block finally

14  disclosed that a massive data breach that had *occurred over four months earlier*, before the

15  December 17, 2021 fairness hearing before NSW Court and well before the January 31, 2022

16  Merger exchange.  The Company then admitted that it had already determined that "a former

17  employee downloaded certain reports of its subsidiary Cash App Investing LLC on December 10,

18  2021, that contained some U.S. customer information."  The Company stated further that "these

19  reports were accessed [by the former employee] without permission after their employment

20  ended."

21  63.    In the 8-K, the Company reported that the information accessed in the breach

22  *included customer PII*:  "The information in the reports included full name and brokerage account

23  number (this is the unique identification number associated with a customer's stock activity on

24  Cash App Investing), and for some customers also included brokerage portfolio value, brokerage

25  portfolio holdings and/or stock trading activity for one trading day."  The Company reported that

26  it had launched an investigation with its outside counsel and with the help of a forensics firm.  The

27  Company reached out to "approximately 8.2 million current and former customers" with

28  information about the breach and notified "the applicable regulatory authorities" and law

1    enforcement.  Over the days and weeks following these revelations, the price of Block securities

2    plummeted.  By commencement of this action, Block shares have traded below $60 per share.

3        64.    Months later, hackers were still using the purloined PII for nefarious purposes.

4    Multiple customers' accounts were illegally accessed and emptied.  Cash App login details were

5    still being sold on the dark web and social media marketplaces.  One listing for hacked CashApp

6    accounts even stated that the vendor sold the specific item "multiple times."  *See* Joseph Cox,

7    *Hackers Are Breaking Into and Emptying Cash App Accounts,* August 2 2022,

8    https://www.vice.com/en/article/dy7yyy/my-cash-app-hacked-hackers-stealing-money.

9    **With NSW Court Blind to This Material information, Defendants Push the "Fairness"**
     **Hearing Through Anyway**
10

11        65.    None the foregoing was disclosed, submitted, or even mentioned, to the NSW Court

12   conducting the "fairness" hearing for the Merger.  Nevertheless, despite having affirmatively

13   misrepresented and omitted a bevy of material facts concerning the Company's long history of

14   derelict data security, failure to comply with industry and regulatory standards, and the

15   consequently massive yet undisclosed data breach that had Block had already suffered well before

16   the date of the NSW Court fairness hearing, and thereby depriving plaintiff and other Afterpay

17   shareholders of any opportunity to present to the NSW Court the host of serious concerns and

18   objections posed thereby, defendants pushed forward the "fairness" hearing before the NSW

19   Court.

20        66.    At that time, given defendants complete failure to publicly disclose the omitted

21   information, it was impossible for plaintiff or any other Afterpay shareholder (*i.e.*, putative class

22   members) to appear before the NSW Court during the fairness hearing to present these nonpublic,

23   then still-undisclosed facts.  Defendants conducted the hearing anyway, as scheduled, without

24   regard for the inaccurate and materially incomplete information before the NSW Court, much less

25   for plaintiff and other Afterpay shareholder who were left with no opportunity to consider and be

26   heard on this critical yet undisclosed information.  With the close of the Merger, defendants sold

27   approximately 113 million unregistered Block Shares directly to former Afterpay shareholders.

28

1    67.    No registration statement has ever been filed with the SEC or been in effect with

2  respect to the Block Shares issued by means of the Merger to plaintiff and other former Afterpay

3  shareholders, as alleged herein.  Nor did Block and the individual defendants satisfy all the

4  necessary requirements under §5 of the Securities Act to permit issuance and sale of unregistered

5  shares.  To the contrary, as detailed herein, defendants affirmatively misrepresented to and

6  withheld a host of material information from the NSW Court, thereby blinding the NSW Court to

7  the serious concerns and risks, the negative impact of which was already materializing for the

8  Company before the fairness.  Furthermore, by forcing the fairness hearing through despite the

9  incomplete and inaccurate information before the NSW Court, defendants compounded their own

10  extreme lack of candor with the NSW Court by depriving plaintiff and other Afterpay shareholders

11  of any meaningful opportunity to appear at the so-called "fairness" hearing and raise the vast array

12  of serious concerns and objections to the NSW Court's attention directly.

13    68.    Having defendants pushed the purported "fairness" hearing through on the basis of

14  a materially mischaracterized and incomplete disclosures and submissions to the NSW Court, and

15  in the face of severely improper impediments to the appearance of plaintiff and other Afterpay

16  investors, defendants were able to consummate the illicit sale of millions of non-exempt,

17  unregistered securities to plaintiff and other former Afterpay investors.

18    69.    By means of the conduct herein alleged, each defendant violated, or controlled an

19  employee, agent, or other person who violated, §§12(a)(1), 12(a)(2), and 15 of the Securities Act.

20  Further, Defendants' misconduct constituted a knowing and reckless device, scheme, and artifice

21  to defraud that operated as a fraud and deceit upon Plaintiff and the other members of the Class in

22  violation of §§10(b) and 20(a) of the Exchange Act, including Rule 10b-5(a) and (c) promulgated

23  thereunder.

24                                **LOSS CAUSATION**

25    70.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

26  deceive the market. This artificially inflated the price of Block shares and operated as a fraud or

27  deceit on the Class (as defined below). Later, when Defendants' fraudulent conduct was gradually

28  revealed to the market, the price of Block shares fell precipitously as the prior artificial inflation

came out of the price over time. As a result of their purchases of Block shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

71.     Block's "Safe Harbor" warnings accompanying ostensibly forward-looking statements issued during the Class Period were ineffective, are inapplicable to the fraudulent conduct alleged herein, and do not shield Defendants from any of the liability alleged herein.

## PRESUMPTION OF RELIANCE

72.     At all relevant times, the market for Block securities was an efficient market for the following reasons, among others:

        (a)     Block securities met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

        (b)     As a regulated issuer, Block filed periodic public reports with the SEC and NYSE;

        (c)     Block regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services; and

        (d)     Block was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

73.     As a result of the foregoing, the market for Block securities promptly digested current information regarding Block from all publicly available sources and reflected such information in the price of Block securities. Under these circumstances, all purchasers of Block

1 | securities during the Class Period suffered similar injury through their purchase of Block securities
2 | at artificially inflated prices and the presumption of reliance applies.

3 |        74.    A classwide presumption of reliance is also appropriate in this action under the
4 | Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),
5 | because the Class's claims are grounded on Defendants' failure to disclose fraudulent conduct and
6 | omission of material fact. Because this action involves Defendants' failure to disclose material
7 | adverse information regarding Block's business operations—information that Defendants were
8 | obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is
9 | necessary is that the facts withheld be material in the sense that a reasonable investor might have
10 | considered them important in making investment decisions. Given the importance of the material
11 | adverse information alleged herein, that requirement is satisfied here.

12 | **CLASS ACTION ALLEGATIONS**

13 |        75.    Plaintiff brings this action as a class action on behalf on behalf of persons and
14 | entities who purchased or otherwise acquired Block securities during the period November 4, 2021
15 | and April 4, 2022, including but not limited to all former Afterpay shareholders who acquired
16 | unregistered Block Shares in exchange for Afterpay securities pursuant to the Merger (the
17 | "Class"). Excluded from the Class are defendants and their families, officers and directors of
18 | Block and Afterpay, affiliates of defendants, at all relevant times, members of their immediate
19 | families and their legal representatives, heirs, successors or assigns and any entity in which
20 | defendants have or had a controlling interest. The members of the Class are so numerous that
21 | joinder of all members is impracticable. While the exact number of Class members is unknown to
22 | plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes
23 | that there are at least hundreds of members in the proposed Class based on, *inter alia*, the over 113
24 | million unregistered, non-exempt Block Shares issued in the Merger. Record owners and other
25 | members of the Class may be identified from records maintained by Block, Afterpay, or their
26 | transfer agents and may be notified of the pendency of this action by mail, using the form of notice
27 | similar to that customarily used in securities class actions.

28 |

76.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no conflicts with absent class members and has retained counsel competent and experienced in class and securities litigation.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Defendants' alleged misconduct constituted a device, scheme, or artifice to defraud in violation of the federal securities laws as alleged herein;

(c)     whether a registration statement was in effect for the Block Shares at issue;

(d)     whether defendants offered or sold the Block Shares at issue;

(e)     whether the Block Shares at issue qualified for an exemption from the registration requirement of the Securities Act;

(f)     whether defendants were unjustly enriched by the illicit offer and sale of unregistered shares alleged herein; and

(g)     to what extent the members of the Class are entitled to rescission, and accounting, disgorgement, or other legal and equitable remedies.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, while the unjust profits generated for defendants by means of their uniform misconduct is substantial, the harm suffered by individual Class members, who are geographically dispersed, may be relatively small, such that the expense and burden of individual litigation could make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder Against All Defendants**

79.     Plaintiff incorporates all the foregoing by reference.  This Count is brought pursuant to §§10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(a) and (c) thereunder, on behalf of the Class, against all defendants.

80.     In connection with the purchase and sale of securities, Defendants knowingly or recklessly engaged in a device, scheme, artifice to defraud, act, practice, or course of business conduct that operated as a fraud and deceit upon Plaintiff and the other members of the Class. Throughout the Class Period, the scheme: (i) deceived the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflated and maintained the market price of Block securities; and (iii) caused Plaintiff and other members of the Class to purchase or otherwise acquire Block securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81.     Pursuant to the above device, scheme, artifice to defraud, act, practice, and courses of business conduct that Defendants employed and knew or recklessly disregarded would act as a fraud or deceit upon investors in Block securities, each Defendant participated in directly or indirectly or were responsible for the device, scheme, artifice to defraud, act, practice, and course of business conduct that operated as a fraud or deceit on investors in Block securities.

82.     Block, the Individual Defendants, and senior managers of Block and Afterpay whose scienter can be imputed and who are responsible for the device, scheme, artifice to defraud, act, practice, and course of business conduct had actual knowledge of the device, scheme, artifice to defraud, act, practice, and course of business conduct herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard of the device, scheme, artifice to defraud, act, practice, and course of business conduct in that they failed or refused to ascertain and disclose such facts as would reveal the device, scheme, artifice to defraud, act, practice, and course of business conduct and its impact on the price

of Block securities. These acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. Each Defendant knew or recklessly disregarded that material facts were being omitted as a direct result of the device, scheme, artifice to defraud, act, practice, and course of business conduct as described above.

83.    The Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the operations and content of the conduct of Block. As officers and directors of Block and Afterpay, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Block's businesses, operations, future financial condition, and future prospects. As a result of the device, scheme, and artifice to defraud alleged herein, the market price of Block securities was artificially inflated throughout the Class Period. As a result, Plaintiff and the other members of the Class purchased or otherwise acquired Block securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and were damaged thereby.

84.    During the Class Period, Block securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying upon the integrity of the market, purchased or otherwise acquired Block securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired Block securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases or acquisitions by Plaintiff and the Class, the true value of Block securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Block securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 (a) and (c) promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period.

## COUNT II

### For Violation of §§12(a)(1) and 5(a) and (c) of the Securities Act
### Against All Defendants

86. Plaintiff incorporates all the foregoing non-fraud allegations by reference. This Count is brought pursuant to §§12(a)(1) and 5 of the Securities Act, 15 U.S.C. §77l(a)(1), on behalf of the Class, against all defendants. This Count avers and sounds in strict liability. Plaintiff's claims do not sound in fraud and plaintiff expressly disavows and disclaims any allegations of fraud, scheme, motive, scienter, or intentional conduct as part of this claim, which does not have scienter, or fraudulent intent, or reliance as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter, or intentional conduct to defraud plaintiff or other Class members.

87. Defendants, and each of them, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell unregistered Block Shares, or to carry or cause such unregistered Block Shares to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. The unregistered Block Shares exchanged in the Merger are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), and are subject to, and do not qualify for exemption from, the registration, prospectus, and other requirements of §5 of the Securities Act, §77e.

88. No registration statement has been filed with the SEC or been in effect with respect to the Block Shares issued by means of the Merger to plaintiff and other former Afterpay shareholders, as alleged herein. By means of the conduct alleged herein, defendants sold and solicited, and plaintiff and class members purchased and acquired, non-exempt, unregistered Block Shares pursuant to and directly in the Merger exchange.

89. By means of the conduct herein alleged, each defendant violated, or controlled an employee, agent, or other person who violated, §§12(a)(1) and 5(a) and (c) of the Securities Act.

1  As a result of defendants' violations of §§12(a)(1) and 5(a) and (c) of the Securities Act as alleged

2  herein, defendants are each strictly, and jointly and severally, liable to plaintiff and the Class.

3        90.      As a result of defendants' violation of the Securities Act, plaintiff and the Class

4  have sustained damages, and defendants have been unjustly enriched.  *Inter alia*, plaintiff and the

5  other putative class members demand rescission, hereby constructively tender to the extent

6  required by the Securities Act, seek and are entitled to an accounting and disgorgement of

7  defendants' unjust profits, and seek an order imposing injunctive relief that, among other relief,

8  provides a mechanism by which plaintiff and putative class members can obtain rescission and

9  otherwise elect among remedies to which they prove entitlement at judgment.  This action is

10  brought within one year after the violation on which it is based, and within three years after the

11  unregistered Block Shares at issue were sold pursuant to the Merger.

12

13                                    **COUNT III**

14                  **For Violation of §12(a)(2) of the Securities Act**
                                **Against All Defendants**

15        91.      Plaintiff incorporates all the foregoing non-fraud allegations by reference.  This

16  Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the

17  Class, against all defendants.  This Count avers and sounds in strict liability and negligence.

18  Plaintiff's claims do not sound in fraud and plaintiff expressly disavows and disclaims any

19  allegations of fraud, scheme, motive, scienter, or intentional conduct as part of this claim, which

20  does not have scienter, or fraudulent intent, or reliance as required elements.  To the extent that

21  these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are

22  incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter,

23  or intentional conduct to defraud plaintiff or other Class members.

24        92.      By means of the defective offering materials for the Merger, which constituted a

25  prospectus within the meaning of §12(a)(2) of the Securities Act, each of the Defendants promoted,

26  solicited, and sold Block shares to the Class.

27        93.      The offering materials for the Merger contained untrue statements of material fact,

28  and concealed and failed to disclose material facts, as detailed above.  Defendants owed plaintiff

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 29

and the other members of the Class who purchased Block shares the duty to make a reasonable and diligent investigation of the statements contained in the offering materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the offering materials as set forth above.

94.     Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the offering materials at the time plaintiff acquired Block shares.

95.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Block shares sustained substantial damages in connection with their purchases of the securities.  Accordingly, plaintiff and the other members of the Class who hold Block securities issued and solicited pursuant to the offering materials have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to defendants sued herein.  Class members who have sold their Block securities seek damages to the extent permitted by law.

**COUNT IV**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

96.     Plaintiff incorporates all the foregoing by reference.  This Count is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of the Class, against all defendants.

97.     The Individual Defendants were controlling persons of Block or Afterpay by virtue of, *inter alia*, their positions as the most senior officers and directors of Block and Afterpay, their substantial share holdings, their executive management positions, and their direct involvement in and responsibility for the negotiation, execution, and implementation of the Merger, and the device, scheme, and artifice to defraud alleged here, including the illicit sale of non-exempt, unregistered Block Shares alleged herein.  The Individual Defendants had the power to exercise

control over Block and Afterpay, and employees thereof, and exercised that power to control with respect to the Merger and and the device, scheme, and artifice to defraud alleged here, including the illicit sale of non-exempt, unregistered Block Shares alleged herein.   Each Individual Defendant also exercised control of Block, Afterpay, employees thereof, and the Merger though a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Block and Afterpay.  Further, Block controlled its employees.

**COUNT V**

**For Violation of §15 of the Securities Act**
**Against All Defendants**

98.      Plaintiff incorporates all the foregoing by reference.  This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against the defendants.  This Count avers and sounds in strict liability.  Plaintiff's claims do not sound in fraud and plaintiff expressly disavows and disclaims any allegations of fraud, scheme, motive, scienter, or intentional conduct as part of this claim, which does not have scienter, or fraudulent intent, or reliance as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scheme, motive, scienter, or intentional conduct to defraud plaintiff or other Class members.

99.      The Individual Defendants were controlling persons of Block and/or Afterpay by virtue of, *inter alia*, their positions as the most senior officers and directors of Block and Afterpay, their substantial share holdings, their executive management positions, and their direct involvement in and responsibility for the negotiation, execution, and implementation of the Merger and the illicit sale of non-exempt, unregistered Block Shares alleged herein.  The Individual Defendants had the power to exercise control over Block and Afterpay, and employees thereof, and exercised that power to control with respect to the Merger and the illicit sale of non-exempt, unregistered Block Shares alleged herein.  Each Individual Defendant also exercised control of Block, Afterpay, employees thereof, and the Merger though a series of direct or indirect business or personal relationships with other directors or officers or major shareholders of Block and Afterpay.  Block controlled its employees.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Certifying this class action, appointing plaintiff as a Class representative, and appointing plaintiff's counsel, Hedin Hall LLP, as Class Counsel on behalf of the Class;

B.      Awarding damages in favor of plaintiff and the Class against all defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.      Awarding the right to rescind and recover the full consideration paid for the unregistered Block Shares received in the Merger;

D.      Ordering registration pursuant to the Securities Act of the unregistered Block Shares issued in connection with the Merger;

E.      Ordering an accounting and disgorgement of defendants' unjust profits;

F.      Ordering the Company to take all necessary actions to prevent any future issuance and interstate sale by the Company of non-exempt, unregistered securities in violation of the Securities Act; and

G.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

H.      Awarding such other equitable or injunctive relief as deemed appropriate by the Court.

**DEMAND FOR JURY TRIAL**

On behalf of himself and all others similarly situated, plaintiff demands a trial by jury.

DATED:  January 31, 2023                    HEDIN HALL LLP


                                                 *s/David W. Hall*
                                                 DAVID W. HALL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HEDIN HALL LLP**
DAVID W. HALL (SBN 274921)
ARMEN ZOHRABIAN (SBN 230492)
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone:  415/766-3534
415/402-0058 (fax)
dhall@hedinhall.com
azohrabian@hedinhall.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON (SBN 174882)
FrankJ@johnsonfistel.com
501 West Broadway, Suite 800
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

Attorneys for Plaintiff and Putative Class